And our final argument this morning is Alexander v. Cross. Mr. Rotman. Yes, thank you. Good morning, Your Honors. May it please the Court, Keith Rotman on behalf of Plaintiff and Appellant Ananjan Alexander, I'd like to reserve three minutes of rebuttal time, if I could. Just keep an eye on the clock. Yes, sir. There's an old maxim that there are three types of arguments, the one you prepare, the one you deliver, and the one you think of on the way back to the office. In this case, I prepared two arguments. One, a policy-based argument on qualified immunity, which I clearly understand this Court has no authority to overturn that doctrine. And one, a factual-based one based on the case law. I hope you're going to do number two. I hope so. I was a little anxious. I'm very sympathetic to you on number one, but our writ is limited. Yes, sir. And I understand that clearly. Now, not to sound coy, but the legal standard under prong two is itself clearly established. And the Ninth Circuit en banc just recently last week, or this week, actually, in the State of Hernandez v. City of Los Angeles, re-quoted that standard in a Fourth Amendment shooting case. But they pointed out something that I didn't really address in any of my briefs that I think hits home to me, is that specificity in prong two is especially important in the Fourth Amendment context, where we typically have officers in the field operating under extremely high-pressured, quickly-evolving circumstances. Whereas in this case, there was extensive time for deliberation and decision-making on the part of the state officials. And under those circumstances, the more general application of law would apply in the prong two context. And that's what I'd like to focus on today. Could you – I take that point, and I want to come back to it. If I were doing what we do in the Fourth Amendment context and looking for a case, your best case, closest on the facts, because, as you know, and the reason I'm frustrated on your first argument is the Supreme Court routinely bats us about the head and shoulders on whether we're operating at too high a level of generality, what's your best case? Yes, Your Honor, that's the very question that the district judge asked me as well. So I'm going to rely upon the same cases I did there. Brown v. Buds was a Seventh Circuit case from 2005 that I cite in my opening brief. That leads to a question I want to – because the Seventh Circuit cases are your best cases, but they're Seventh Circuit cases. And I think we can rely on cases from other circuits to the extent that they represent a national consensus. But can we really rely on the Seventh Circuit cases in this case? I think you can, Your Honor, because the Ninth Circuit cases that I also cite in my brief touch upon the same areas. Get to those and tell me how the domestic cases help you. If I might, Your Honor. Well, let me approach it this way. In 2024, the Ninth Circuit – let me start over, I'm sorry. Robinson v. Prunty is cited on page 25 of my brief, and that is the best Ninth Circuit case I had. And decided when? That was decided in 2001. So the reason I rely upon a lot of out-of-circuit cases is because I try and try as I might, I couldn't find a specific Ninth Circuit case that was as close to this one. And I think the reason is stated ably by my opponents and the officers in their declarations. There are thousands of transfers of prisoners day in and day out throughout the state of California, which I believe has one of the largest prison populations in the country. And not all of these individuals bring lawsuits involving injuries that they suffer. A lot of them sort of peter out at the lower stages, either at the administrative level in the prisons or at the district court levels. So it's hard to find a specific case on point. But we're talking about excessive risks of harm placed in – and that was an integrated yard where racial animus was at issue here. But we're still talking about a white supremacist and an Indian-American plaintiff who alleged that he was assaulted viciously and sent to the hospital with a fractured orbital socket because both of his race and his race. Can I ask you, you seem to have switched theories somewhere along the way, wasn't it? Your client was attacked because of the nature of his crimes and because he was attacked because he was on racial grounds. Are you asserting both? We do assert both. The majority of his claim was that he was a sex offender. That was the gist of his claim. And that's what I take the appeal to be directed at. Yes, sir. And so – and it's on that grounds that I want to ask you about the facts of this case because I think they matter for qualified immunity. For better or worse, the prison officials that you sued went through a process. They evaluated this inmate's situation, whatever progress he'd made or not made. Four people did it, and they ended up concluding that he was ready to be transferred to a different level of security. I can't find a case that involves that kind of thoughtful, albeit perhaps negligent process in this case. Do you have one that sort of helps me along those lines? Most of the cases just involve a transfer. Yes, Your Honor. Nobody paid any attention to the fact that this guy might create a danger. They knew about his history. They knew there was a potential. But they made a decision that he was no longer a danger. Turns out they blew it. But is blowing it enough to get them out of qualified immunity? Well, that is quintessentially, I would say, a prong one question, which I've already prevailed on before this court. The issue then becomes is – Should they have known that in 2018? Should they have known that in 2018? I would say yes because the body of law throughout the United States, and that's why I cite a lot of other cases from other districts, puts people, including the Supreme Court, puts these official on notices that they have to be sensitive to the potential for danger that other inmates may suffer. But they were in this case. They understood that he posed a danger to others. They understood that he had a history. And they looked at it and they concluded, incorrectly, that he'd grown out of it. That's only half the question, though. They're also, we assert, obligated to look at the sensitivity of people like Mr. Alexander to be preyed upon by these other inmates. A lot of inmates, and we submitted expert testimony on this from a former deputy warden, that a lot of inmates play the long game and they behave for a period of time. And I understand this is a question of fact and credibility for the fact finder. They play the long game to get transferred to prisons where they have more opportunities for better living conditions because they don't want to spend time in the hole up at Pelican Bay or in higher security prisons. So they'll behave for a time, but clearly, as the court said, somebody blew it here because this gentleman wasn't there for very long before he viciously assaulted my client. But looking at what Mr. Sorry, I'm getting bad with names as I get older. Mr. Rizzo, excuse me. Mr. Rizzo was only half of the obligation of the defendants. They were also obligated to look and see if there's anyone like Mr. Alexander who might suffer from Mr. Rizzo. And they actually took some steps to do that. The problem we had here was that Mr. Officer LaRocco's crown that he testified under oath he put in Mr. Alexander's file that described the danger he suffered from people like Mr. Rizzo and Mr. Rizzo's son-in-law and the other individual who attempted to extort Mr. Alexander that was also a member of a white supremacist gang went missing. So there's clearly something amiss with the record keeping, but we assert that it's clearly established just from the body of principle, body of case law, that these defendants are obligated not just to check out and see if Rizzo's suitable for transfer, but where they're sending Mr. Rizzo to, is there anyone there who has a particular sensitivity to Mr. Rizzo's predilections that may, that Mr. Rizzo when he gets there may be triggered by? Can I ask you? Even if they've concluded that he no longer has those predilections. I'm sorry. Even if they've concluded that he no longer has those predilections. See, that's what concerns me at the case. They went through a process, plainly flawed because the result says so, but they went through a process and said, yeah, this is not a guy we would ordinarily transfer, but we've now looked at his record and he's reformed. He's better. He's okay. And so he no longer poses a danger to others that he might have 10 years ago. And that's what troubles me about the qualifying hearing process. Well, I am certainly in favor of rehabilitation of inmates, and that's a laudable goal, and we do want to do that. We want to rehabilitate people to the best of our ability, but the expert testimony we submitted suggested that Mr. Rizzo was not suitable for a transfer because of his point score, which was an objective measure. Sure, he wrote for the prison newspaper and he did all these other things, but, again, I think that's a question of fact, that a fact finder would have to decide whether it makes that reasonable to make that transfer. Well, not when we're looking at clear lists. Now we're back. I understand this is a difficult case because we already know that there was an Eighth Amendment violation. We're trying to figure out whether or not in 2018 these officials could have known they were violating the Eighth Amendment. And so I'm still back to the notion that they said, okay, we don't want to just transfer this guy willy-nilly. We'll go through a process. We'll look at everything. They look at everything and say, we think he's not a danger anymore, so we're now going to transfer him. And I'm trying to find a case that suggests to me that they should have known in 2018 that what they were doing violated the Eighth Amendment. Well, I think, again, I think that's the clearly established body of law that there's all the case law. I mean, prison officials are trained and they learn the case law, unlike the officers out on the field. So they have the time for deliberation. But I think it's just as a general principle they understand that not only do they need to look at the offender that they're transferring to see if, does he pose a risk to anyone where he's going, but they also need to look at where he's going. Is anyone there at risk from him?  And so in Robinson, which you identified as the best case here, I mean, they had had repeated outbreaks of violence on the basis of race. The guards sort of joked to the plaintiff about the fact that they were putting him in with people of a different race. And we described the court there described that as like a gladiator like scenario. We don't have anything like that here, do we? Well, what we have is an individual, as I touched upon earlier, who was the subject of a extortion type shakedown from a white supremacist who was transferred out. And there were all the issues relating to whether Mr. Alexander somehow tried to retaliate against him. So there was a well-bodied write-up of documents, some of which went missing apparently, that related to Mr. Alexander's sensitivities. So I don't think it's in a vacuum where these decisions were being made. No, it's not a. I was just pointing out that you're into your rebuttal time. So if you want to. Oh, no, no. I'll reserve. I'd like to reserve my rebuttal time if I might. Thank you very much. Let me just have a moment. I made that mistake the last time about the yellow light. Mrs. Ellenbach. Thank you, Your Honors. May it please the court, Deputy Attorney General Martha Ellenbach for the defendants at police. This court should find that the defendants are entitled to qualified immunity because there is no clearly established law that put them on notice that endorsing the transfer of inmate Rizzo from High Desert Sensitive Needs Yard to a similar sensitive needs yard at Alexander's institution was clearly unlawful. And the specific facts of this case really show why there was no established law on point and why the defendants would have understood that what they were doing was not clearly unconstitutional. Rizzo had renounced his membership with a white supremacist group years before this in 2008. I'm having difficulty on this issue. Is this a case about a racially motivated attack or an attack because of the nature of the crime that Mr. Alexander? I think Mr. Alexander has put forth both theories. There's no actual evidence in the record about why this attack took place. But even assuming that it was maybe a combination of those characteristics, the fact remains that Mr. Rizzo was housed with individuals with similar characteristics on that sensitive needs yard at his institution at High Desert where he had lived peacefully with them. And certainly the behavioral override regulations that defendants applied, they applied those correctly. There's no dispute in the record about that. Well, this is a strange case because the previous panels already found that your clients violated or there's a fact issue about whether your clients violated the Eighth Amendment. So sometimes when we do this, we sort of lapse over and say, well, what they did was reasonable and they went through all the processes. But we already know there's a fact question about whether there was an Eighth Amendment violation. So the real question is not whether they followed the procedures or did everything else, but whether there's a case out there that would have put them on notice that what they did in 2018 violated the Eighth Amendment. I want to make two points in response to that, Your Honor. The first is that I think that that second piece about whether or not there is a case that would have put them on notice, the fact that they followed policy is certainly relevant to that piece. And so what we do in that second prong is we do look at the undisputed facts. We look at if there is a dispute about something, certainly this court has to take those facts in the light most favorable to the plaintiff. But here there's no dispute about certain key facts in the record. For example, there's no dispute about the fact that the defendants had this particular limited knowledge about Mr. Rizzo's history, that they were looking at this, that they did apply the regulations when they were evaluating whether or not he was appropriate for a behavioral override. And nothing in the record disputed that they were properly applying the regulations. My friend on the other side referred to a declaration from an expert. The expert did not dispute that they followed the regulations properly. But in any event, so the question for the second prong of qualified immunity is accepting those undisputed facts is true. Is there a case that would have given those defendants notice that what they did was unlawful? And the cases that the plaintiff cited simply wouldn't have put the defendants on notice. All of those cases involved a combination of a particular threat that was communicated recently in time to the defendants. And we don't have that here. And there's one piece of that that I want to clarify for the court. Counsel referred to a declaration of Officer LaRocco and some sort of conspiracy among individuals at Donovan to allegedly attack Alexander. Even assuming that that's true, there's no dispute that the defendants in this case had no knowledge of anything about that. That was not in Mr. Rizzo's file. There's no facts that they looked at that would have made them aware of any sort of conspiracy or particularized threat in that sense. And so that's really the difference between this case and a case like Howard where the plaintiff didn't necessarily know who would have attacked him. But he was telling the defendants, hey, I am at risk from this particular prison gang. That's not something that happened here. Here the defendants were simply evaluating Rizzo for a transfer. And so they're looking at his particular characteristics to determine whether he can transfer to this other institution. And if you look at the briefing. I want to ask you on that score. The district court in finding qualified immunity said there's no evidence that the defendants were aware of Alexander or his specific vulnerability. That's correct, Your Honor. Doesn't a former case from the Supreme Court say that's irrelevant? If you know there are people in the population that might be vulnerable to attack by somebody you send in, you don't have to have identified this specific plaintiff as somebody vulnerable to attack, do you? Well, I think that in some instances not necessarily. For example, in Howard, they knew that this particular plaintiff was vulnerable to attack, but they didn't know who precisely was going to attack him. And that's not necessarily dispositive. But you need some sort of evidence or all of these cases really relied on evidence of a particular threat. There's no case where a court has found that this sort of remote incident of potential violence, that a defendant is simply reviewing as part of an inmate's kind of holistic characteristics. Let me change the facts on you. Let's assume the defendant officials just said, I want to transfer this guy because we're overcrowded here and we want to send him over there. We know he has a propensity to attack child molesters and stab them in the face. We're aware of that. We're going to transfer him anyway. And he did what he did. Would there be an Eighth Amendment claim? Not necessarily, Your Honor. I think they need to look at, well, did they know that the particular prison they were transferring him to was dangerous? Had child molesters in it. Or if it would pose a danger, like maybe simply because he's housed with other child molesters. See, I think then it gets very close to these previous cases that say you are acting with deliberate indifference when you put a dangerous person in close proximity to people that you should know would be likely victims. Well, I think that that line of argument is really calling into question the Department of Corrections' entire sensitive needs yard set up here, which is not something the defendants. No, and I ask you to put that aside. See, that's my problem. I understand in this case they went through all kinds of procedures and they had all kinds of rules and regs. Well, and also the sensitive needs yards all house sex offenders. Rizzo was housed with sex offenders before his transfer. So the defendants. And he stabbed one of them in the face. I believe that occurred in 2003, so many years before.  Yeah, I don't know the details of that. But the fact of the matter remains, the sensitive needs yards were designed to house individuals with particular security concerns, and the idea is gang dropouts, sex offenders, all of these individuals have concerns that would have prevented them from being housed on a general population yard. But the defendants in this case, they didn't have the ability to change Rizzo's housing on a sensitive needs yard. He was going to be housed there because he had dropped out of a gang, and that's simply the way that the prison setup worked, that these particular people were housed as a group. So to the extent that this court, I think it would be really problematic to find the defendants in this case liable based on something that they couldn't have changed. And similarly, the behavioral override regulations are designed to guide prison officials in determining whether or not a prisoner is appropriate for that type of transfer to an institution where he might have those additional rehabilitative opportunities. And there's a motivation for that inmate, if he wants to participate in those opportunities, to remain discipline-free once he's transferred, because then he's able to stay at that facility. So certainly that also, again, to say that it was clearly unconstitutional when there was no case that would have given the defendants any sort of notice that these regulations were clearly unconstitutional, I mean, these are regulations that CDCR had had in effect and I believe still has a version of in effect today, that when Section 3375.2 authorizes behavioral overrides when officials determine that that inmate's behavioral record indicates they could successfully place at a facility. I've had this difficulty with this case from the beginning, because you're really now lapsing back into whether there was an Eighth Amendment violation under the facts of this case. And what the previous panel told us that, taking the facts in the light most favorable to the plaintiff, there was. And so I understand that they followed the regs and did everything else, but we start out with the presumption in this case that he's created a fact issue about whether there was an Eighth Amendment violation. So the only issue for us, I think, is whether or not your clients should have known that in 2018. Not whether or not following the regs is a good thing or a bad thing, or whether or not it's effect on the prison system in general. We're really focused on a very narrow issue. And I had the same difficulty in analyzing this case, because I kept going back and saying, well, they followed the regs. Did that really violate the Eighth Amendment? But the panel told us if the facts are taken into light most favorable to them, it did. So go back to the case law for me. I think it is, first of all, briefly, it is relevant to that second prompt question, because there does need to be a case that would have put them on notice that this particular situation was unconstitutional. If there was a case that said defendants followed the regulations, but unreasonably determined the amount of risk, having gone through the regulatory process, all the things they were supposed to, but their ultimate determination was unreasonable. They disregarded a substantial risk and approved the transfer anyway. I think that's what the panel was saying a reasonable jury could find in this case. But let's say a case had decided that. Then would it be clearly established in this case that following the regulations, the defendant can still effectively end up disregarding a substantial risk? I think more broadly, Your Honor, yes. If there's a case with certain similar facts that are similar enough. So you're saying that's what's missing here, is that even having sort of done what we were supposed to do, right, but we made a terrible mistake in our calculation of the risk. Yes, Your Honor. Then that would be enough, you think? Well, qualified immunity does protect those reasonable but mistaken, ultimately mistaken judgments. And it turns out six months later that there was a mistake. But it's also, you know, again, the fact that this is reasonable, there needs to have been a case on point. I guess I hear what you're saying is the facts that distinguish this from other cases where we've said there's a violation when you disregard a substantial risk is that here they were following they did engage in a careful process of review in order to calculate that risk. And there might be a case in which their calculations were so grossly reckless, you know, like even having gone through the process, that a jury could still find a violation. But you're saying we weren't on notice that having followed the procedures, we could be committing a violation. Is that a fair characterization of your argument? That's part of it, yes, Your Honor, is that they did take those steps to minimize that risk by applying these behavioral override regulations and looking at there's a memorandum in the record that gives particular exclusionary criteria, says this type of inmate with this type of disciplinary history is not eligible, and they did apply that as well. Mr. Rizzo, for example, he didn't have any discipline in the past year, which could have excluded him from behavioral override consideration. And then also there's that second piece of there's no case on these unique facts where the incident of violence, particularly in 2003, is really remote, where a court found that this type of allowing an inmate to be on a particular yard was unconstitutional. In Howard, in Brown, in Robinson, those are all cases where there was a risk that was recent in time that was communicated to the defendants. There was particular threats. In Robinson, the defendants knew about that gladiator-like scenario, as Your Honor had pointed out. So the risk there is significantly different both in time. What do we do with the 2015 incident? The 2015 incident, again, was remote, and that wouldn't have excluded him from behavioral override. I believe that that incident was where Mr. Rizzo and his roommate were found with a knife, and there was some evidence that he may have, him or his roommate, might have intended to do something with that. I mean, I think this is why the prior panel said some of this would be for a jury to decide. That's right, Your Honor. But those facts are undisputed, and that's why, again, we're taking the undisputed facts about what defendants knew, which is that they didn't know anything about a conspiracy or anything more than Rizzo's two particular incidents. The question for this Court is whether or not that would have been enough to put them on notice, that this transfer to another facility where there was not necessarily a reason to believe that the transfer would pose a danger to anybody was clearly unconstitutional. I mean, certainly this Court found that there's a question that a jury could find. The risk was great, but there's also significant evidence that goes the opposite way, and that's really the Estate of Ford case as well, and that's why we believe that's the most important case to look at here is it is one of those difficult situations, and certainly housing and transfers present security concerns, but there are also countervailing concerns that prison officials need to look at about creating those opportunities for rehabilitation, creating those opportunities for those people who have successfully housed peacefully for a number of years, and so this Court should take that into account as well, and that's an important part of the things that the defendants in this case were considering, and that's why there needed to be a particular case on point. This was not a case where there's a clear or obvious constitutional violation, and looking at the cases, certainly Mr. Alexander hasn't provided any case where individuals who made a transfer decision, anything like this one, were found to have violated the law. Thank you. Ms. Ellenbach? Thank you, Your Honors. Mr. Ruttman, rebuttal? Very brief, I think. Judge Sung pointed in her question asking Ms. Ellenbach to frame. The argument pointed out the best reason why this Court should reverse. These defendants did know of their duty to take care that they not place any individuals at risk by transferring Mr. Rizzo or any other prisoner for that matter, and that's why they went through all the steps that they did. But a jury, as we know from the prior panel, could determine that that was an unreasonable risk. This is not a situation where they just weren't guided by any principle in making the decisions that they did, and I think that's what the prong to stands for. Isn't that the line of reasoning that's rejected in Saussure against Katz, and then as applied to this at the moment context by us in the State of Ford, that just because you know the general principle that you can't be deliberately indifferent, that doesn't mean that you're on notice that your particular conduct will be found to be a constitutional violation, right? Well, I think the State of Lopez versus the City of Los Angeles just addressed that earlier this week, and they said that you don't have to drill down on a specific case. Right. I mean, that's the crux of the problem is how far you have to drill down, but I think the problem I have here, to be honest with you, is that none of the cases that are cited for clearly establishing a law involve the mitigating factors, I would say here, of having engaged in the process of attempting to evaluate risk before the transfer, and evidence of, I think, looking at the evidence in the light most favorable to your client, although evidence of risk, also some evidence suggesting the risk had dissipated, right? And so there's, you know, that is, assuming that is the appropriate level of factual detail, or at a minimum, you know, having gone through a process of attempting to objectively evaluate the risk, and having multiple people essentially reach the same conclusion, albeit, you know, there's a possibility a jury would say they were all terribly wrong, right? You know, there's that they were on notice that having gone through at least the procedures they were supposed to go through, they could still be committing a terrible violation. I think that's what happened way back when, as State of Ford suggested, that prior Ninth Circuit case laws I addressed in my reply brief no longer holds validity because of Saussure. They used to say that when there's a clear Eighth Amendment violation, you don't have to get to prong two, and then the court of another panel of this court came out and said, well, that's been undermined by Saussure, and you do have to address both, or you can get to do them in either order, and that, I think, poses the very problem we have is that there are so many prisoner transfers and so many different possible calculations that it would be impossible to create a body of case law in our circuit robust enough to put officials on notice of every possible combination. In effect, you've done so, although it's a mem disp, but in effect, you've done so in this case. I mean, there's a case now that puts, even though it's non-precedential, puts California officials on notice that they can violate the Eighth Amendment by doing this. The question, I guess, in my mind is, had that occurred before this? If it had, it's not reported, and I wasn't able to find it. That's why I have to rely upon just the general principle of law. Thank you so very much. Thank you, counsel. We thank both counsel for their helpful arguments, and the case is submitted, and we are adjourned. Thank you. Have a nice weekend. Thank you. All rise. This court for this session stands adjourned.
judges: HURWITZ, MILLER, SUNG